# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| RYAN LEE RAYFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 1:23-CV-80-JRG-CHS |
| | ) | |
| ZACHARY YOUNG and | ) | |
| THOMAS FINK, | ) | |
| | ) | |
| Defendants. | ) | *Lead Case Consolidated with* |
| _____ | ) | |
| RYAN LEE RAYFIELD, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 1:24-CV-56-JRG-CHS |
| | ) | |
| BRADLEY COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

In this consolidated action, Plaintiff, through counsel, alleges that he was subjected to an

excessive use of force while incarcerated in the Bradley County Jail [Doc. 1; Doc. 1 in *Rayfield v.*

*Bradley Cnty.*, No. 1:24-cv-56].  Defendant Bradley County (hereinafter, the "County") has filed

a motion for summary judgment [Doc. 64], to which Plaintiff has responded in opposition [Docs.

92, 99], and the County has replied [Docs. 93, 100].  Also before the Court are the motions filed

in the member case, *Rayfield v. Bradley Cnty.*, [Docs. 19, 20, 23, 24, 25, 26, 28, 29, 29, 30, 31 in

No. 1:24-cv-56].  Upon consideration of the Parties' pleadings, the summary judgment evidence,

and the applicable law, the Court finds that no genuine issues of material fact preclude the grant

of summary judgment to the County as to Plaintiff's *Monell* claim, but that summary judgment is inappropriate as to Plaintiff's claims against the County pursuant to Tenn. Code Ann. § 8-8-302.

## I. MEMBER CASE FILINGS

After the Court consolidated these cases pursuant to the Parties' agreement and told the Parties to file documents only in the lead case [Doc. 55 p. 1–2], the Parties improperly filed several motions in the member case, *Rayfield v. Bradley Cnty.*, No. 1:24-CV-56 [Docs. 19, 20, 23, 24, 25, 26, 28, 29, 29, 30, 31]. Accordingly, the Clerk is **DIRECTED** to terminate all pending motions in the member case [*Id.*].

## II. SUMMARY JUDGMENT MOTION

### A. Standard

Summary judgment is proper when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is deemed "material" if resolving that fact in favor of one party "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of their case for which they bear the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322; *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).

Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd.*

2

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 888 (1990), or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan*, 497 U.S. at 889).

### B. Evidence

#### 1. Undisputed Facts and Relevant History

On February 10, 2023, Plaintiff was a pretrial detainee housed in C-pod at the Bradley County Jail [*See* Doc. 1 p. 4]. Sometime around 8:30 to 9:00 a.m., Plaintiff asked the pod officer, Officer Johnson, about his court appearance that day [Doc. 92-3 p. 2–3, 4]. Officer Johnson did not know anything about Plaintiff's court date, so Plaintiff requested to see a supervisor, because he did not want to miss his court appearance [*Id.* at 4, 8]. At the time Plaintiff made his request, Officer Johnson had called a lockdown, because an inmate had stolen a trash bag [*Id.* at 6–7, 9–10]. While Officer Johnson made a telephone call about Plaintiff and the inmate who had taken the trash bag, Plaintiff waited in the dayroom with the other inmates [*Id.* at 6, 9–10].

A short time later, Defendants Sergeant Zachary Young and Officer Thomas Fink entered C-pod and ordered Plaintiff to put his hands behind his back [*Id.* at 11–12]. It is disputed whether Plaintiff attempted to comply with that order [*See* Docs. 1 p. 4[1]; 66-4 p. 4; 66-5 p. 4–5; 92-3 p. 12;

---

[1] Plaintiff filed his complaint pro se [Doc. 1] and later obtained counsel [Doc. 45]. Plaintiff's pro se complaint, which is signed under penalty of perjury, "carries the same weight as would an affidavit for the purposes of summary judgment." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

99-3 p. 2, 4].  But the Parties agree that Defendants Young and Fink then each discharged their tasers twice [*See* Docs. 66-4 p. 4; 66-5 p. 6–7; 92-3 p. 12].  No warning was issued before the tasers were deployed against Plaintiff [Docs. 92-2 p. 11; 92-1 p. 13].  Plaintiff did not experience neuromuscular incapacitation as a result of being tasered [Docs. 66-4 p. 4; 66-5 p. 6, 7; 92-1 p. 10; 99-3 p. 7].

Defendant Fink approached Plaintiff, grabbed Plaintiff, swept Plaintiff's legs out from under him, and Plaintiff fell onto the floor [Docs. 92-1 p. 11; 92-2 p. 8; 92-3 p. 13–14; 99-4 p. 3].  Plaintiff suffered facial injuries as a result [Docs. 1 p. 4; 66-4 p. 4; 92-1 p. 11; 99-5 p. 3].  Plaintiff was given a towel, and he was transported to medical [Docs. 1 p. 4; 66-4 p. 4; 92-1 p. 12; 92-2 p. 7; 92-5 p. 1].

Plaintiff was not physically threatening toward anyone before the officers deployed their tasers [Doc. 92-1 p. 12–13; Doc. 92-2 p. 10].  Plaintiff did not use force against a deputy, he did not have a weapon, and he made no attempt to disarm a deputy [Doc. 92-1 p. 8–9].  Neither did Plaintiff actively resist being transported by officers by bracing himself, pulling away, or attempting to hold onto objects [*Id.* at 13–14].

Plaintiff filed his lawsuit pro se on April 10, 2023, against Young and Fink individually.[2] Plaintiff then obtained counsel [Doc. 45] and filed a second lawsuit against Defendant Bradley County, asserting that the County lacked adequate customs, practices, policies, procedures, supervision, investigation, and training that was the cause of the claimed constitutional violation. [*See* Doc. 1 in No. 1:24-cv-56.  Plaintiff has also asserted State law claims against Defendants Fink and Young for assault and battery and a State law claim against the County pursuant to Tenn.

---

[2] Officer Johnson was initially named a Defendant in this action but was dismissed when the Court screened Plaintiff's complaint in compliance with the Prison Litigation Reform Act, 28 U.S.C. §§ 1915(e)(2)(B) and 1915A [*See* Doc. 4].

4

Code Ann. § 8-8-302 [Doc. 1; Doc. 1 in No. 1:24-cv-56]. Upon the Parties' motion, the Court consolidated the actions [*See* Doc. 55].

### 2. Plaintiff's Proof

After Officer Johnson contacted his supervisor upon Plaintiff's request, he reported to Plaintiff that they were "not to[o] happy" [Docs. 1 p. 4; 66-3 p. 4; 92-3 p. 4]. When Defendants Young and Fink entered the pod, they immediately told Plaintiff to put his hands behind his back [Doc. 92-3 p. 12]. Plaintiff held his hands up and stated, "I'm not trying to cause any problems, guys" [*Id.*]. The officers again instructed Plaintiff to place his hands behind his back, and as he began to comply, tasers were fired [*Id.*]. Plaintiff's hands were completely behind his back when he felt the electricity from the tasers [Doc. 99-3 p. 4]. Multiple prongs from the tasers hit him and penetrated through his skin, while others remained stuck to his uniform [*Id.* at 6, 9].

After Plaintiff was tased, Officer Fink forced Plaintiff's hands behind his back and began handcuffing him [*Id.* at 5]. As Officer Fink was handcuffing one of Plaintiff's wrists to the other, he placed his hand in the small of Plaintiff's back and then pushed Plaintiff forward while simultaneously sweeping Plaintiff's legs out from under him [*Id.* at 7, 8]. With his arms restrained, Plaintiff fell face-first onto the concrete floor, which "ripp[ed] [his] top lip open, shatter[ed] two front teeth, and fractur[ed] [his] jaw" [Doc. 1 p. 4]. Officers then covered Plaintiff's face with a towel and took him to medical, where he received Ibuprofen and a stitch in his lip [Doc. 1 p. 4; Doc. 92-3 p. 16]. A subsequent x-ray revealed that Plaintiff's jaw was fractured [Doc. 1 p. 4]. Plaintiff saw an oral surgeon but has an overbite now because his injury was not initially treated properly [Doc. 92-3 p. 19]. Plaintiff did not receive a disciplinary writeup because of these events [*Id.* at 16].

The County's written policy specifically addressing the use of force includes a "Use of Force Matrix[3]"—or use of force continuum—that identifies the various types of force available to an officer and sets out when and how much force should be used [Doc. 92-4 p. 4]. The continuum lists the available types of force, from the lowest level of force to the highest, as follows: "Officer Presence"; "Verbal Commands"; "Compliance Holds"; "Chemical agent (OC Spray)/Taser Drive Stun"; "Taser—firing of probes"; "Hands, Feet, or Impact Weapons"; "Less Lethal Laucher"; and "Deadly Force" [Id.].

The County's policy provides some guidance on when at what level of force should be used. For example, it provides guidance on the use of the taser [Id. at 7]. It also defines both "active resistance" and "passive resistance"[4] [Id. at 1, 3]. The policy does not, however, provide any specific guidance on the use of hard hand controls and takedowns (i.e., "Hands and Feet"), other than to list them at the same level of force as the use of a baton [Id. at 4]. Additionally, the policy does not specifically identify the type of resistance that would justify a certain level of force. Instead, it states that officers are to use "the minimum amount of force necessary in neutralizing the incident" [Id.].

Defendant Young testified that he was trained that a taser could be used to gain compliance when a subject was only passively resisting by "refusing lawful orders, refusing to be placed in

---

[3] Despite the formal written policy using the term "Force Matrix[,]" County deputies were trained referring to the policy as a "use of force continuum" [See, e.g., Doc. 66-4 p. 12; Doc. 66-5 p. 10.]. The Court refers to the policy as a "continuum" unless directly citing or quoting the record.

[4] "Active Resistance" is defined as: "When a subject makes physically evasive movements to interfere with an officer's attempt to control that subject; including, but not limited to, bracing, tensing, pulling away, actual or attempted flight, or pushing" [Doc. 92-4 p. 1]. "Passive Resistance" is defined as: "When a subject does not cooperate with an officer's commands but does not take action to prevent being taken into custody. For example, a protestor who lies down in front of a doorway and must be carried away upon arrest" [Doc. 92-4 p. 3].

6

handcuffs, refusing to do things" in order attempt to "mitigate injury" that might occur if the officer went "hands on" [Docs. 66-5 p. 21; 92-1 p. 6–7]. Similarly, Defendant Fink testified that he administered the takedown maneuver on Plaintiff rather than physically forcing Plaintiff's hands being his back to handcuff him because Plaintiff had been "refusing directives" and "[t]here was that possibility that he could have tried to fight me or Sergeant Young and put us—our safety in danger, maybe even his own safety. So[,] I figured the way I had been trained with the use of force continuum, you follow it" [Doc. 66-4 p. 13]. Defendant Fink stated he did not receive any training on compliance holds [*Id.*]. He testified that he "never received any compliance holds training" and that use of a takedown maneuver or "[g]oing hands on was the last resort before deadly force" [*Id.*].

Both Sergeant Young and Officer Fink submitted a Subject Resistance Report and Offender Note regarding the incident [Doc. 92-5]. Sr. Lieutenant Jeremy Kanipes, the final supervisor for the use of force against Plaintiff, reviewed these reports and watched a video of the incident[5] [Doc. 93-1 ¶ 7]. But he did not review Plaintiff's grievances, nor was he aware of the injuries Plaintiff suffered [Doc. 99-1 p. 9]. Neither Defendant Young nor Defendant Fink were interviewed about the incident after their reports were submitted [Docs. 66-4 p. 5; 66-5 p. 21]. No other report was produced reviewing the facts of this incident [Doc. 99-1 p. 11]. This is despite the fact that the County's written policy requires employees involved in a use of force that results in serious injury to be relieved of duty and placed on administrative leave "pending a complete investigation and review of the facts" related to the incident[6] [Doc. 92-4 p. 12].

---

[5] This video was not preserved. It was overwritten approximately thirty days after the incident due to the limited size of the server [Doc. 99-1 p. 27–28].

[6] This policy also defines "serious bodily injury" as any injury which "causes serious, permanent disfigurement, or results in long term loss or impairment of the function of any bodily member or organ" [Doc. 92-4 p. 3].

7

Lt. Kanipes ratified the use of force against Plaintiff based on Plaintiff's refusal to obey commands, noting that the County's policy authorized this level of force (i.e. taser and takedown) for anyone refusing an order to lock down [Doc. 99-1 p. 11–12, 16]. In fact, the County trains its officers to default to the use of a taser before going hands on [Docs. 99-1 p. 31; 99-4 p. 2]. And despite Lt. Kanipes' awareness that using a takedown maneuver could cause serious injury, the County provides no training to its officers in the use of such maneuvers [Doc. 99-1 p. 3–4].

On the date of the incident with Plaintiff, Defendant Fink had been a Bradley County officer for less than a year [*See* Docs. 66-2 p. 110; 66-4 p. 7], and Defendant Young had been a County officer a little over two (2) years [*See* Docs. 66-2 p. 35; 92-1 p. 2]. But between them, Defendants Fink and Young had approximately twenty-one[7] other use of force incidents in which they used chemical spray or a taser against individuals for refusing to comply with commands [*See, generally*, Doc. 92-6].

### 3. The County's Proof

At the time Plaintiff requested to talk to a supervisor on February 10, 2023, the pod had been ordered to lockdown [Doc. 66-4 p. 4]. Plaintiff was aware that the facility rules required him to go to his cell when a lockdown is imposed [Doc. 99-1 p. 11–12]. And an inmate refusing to lockdown presents a great security risk in the jail [*Id.* at 17–18, 20]. In fact, going to your cell when told to do so is a very large part of being in custody [*Id.* at 21].

The incident involving Plaintiff began when Officer Johnson reported that an inmate was refusing to comply with the command to lockdown, and Defendants Fink and Young responded

---

[7] Plaintiff states there were twenty-two other incidents, but this appears to double-count an incident where Defendants Fink and Young both made a report about one incident in which they were both involved [*See, e.g.*, Doc. 92-6 p. 30–31, 35].

[Doc. 66-4 p. 4]. And, when Defendants Fink and Young arrived in the pod, they observed Plaintiff refusing to lockdown until he spoke with a supervisor [Docs. 66-4 p. 4; 66-5 p. 4]. Before tasers were deployed, Defendant Young gave Plaintiff multiple directives to turn around and place his hands behind his back [Doc. 66-4 p. 4], while Defendant Fink gave Plaintiff one such command [Doc. 99-5 p. 2]. Plaintiff refused to comply with any directive [Docs. 66-5 p. 5; 92-1 p. 10]. As a result, each individual Defendant discharged his taser twice, but none of the prongs made full contact with Plaintiff [*See, e.g.*, Docs. 66-5 p. 7; 92-5]. As Plaintiff was still non-compliant, Defendant Fink took Plaintiff "to the ground" to gain control [Doc. 66-4 p. 4]. Specifically, Defendant Fink grabbed the back of Plaintiff's uniform with his right hand, Plaintiff's bicep with his left, and utilized a leg sweep to take Plaintiff to the ground [Docs. 99-5 p. 4; 92-5 p. 1, 2]. Defendant Fink testified that Plaintiff was not controlled until he was on the ground [Doc. 66-4 p. 4], and that the only use of force options available to him based on Plaintiff's non-compliance were use of the taser and going "hands on" [Doc. 99-5 p. 2–3].

In accordance with Bradley County policy, both individual Defendants completed Subject Resistance/Use of Force Reports regarding the incident involving Plaintiff [Docs. 93-1 ¶ 4; 92-5]. Neither Defendant Fink nor Defendant Young were investigated for claims of excessive force prior to February 10, 2023[8] [Docs. 66-4 p. 12; 66-5 p. 21]. Lt. Kanipes reviewed the individual Defendants' reports and watched a video of the incident as part of the investigation process [Doc. 93-1 ¶¶ 7, 8]. Lt. Kanipes found the video consistent with the narratives presented in the Subject Resistance reports, and therefore, no further action was taken [*Id.* ¶ 9]. Lieutenant Hickman also approved the individual Defendants' use of force [Doc. 99-1 p. 27].

---

[8] There was an investigation regarding a use of force by Defendant Fink, but that incident occurred four or five months after the use of force incident giving rise to Plaintiff's complaint [Doc. 66-4 p. 12].

9

To be a Bradley County corrections officer, an individual must meet the requirements of the Tennessee Corrections Institute ("TCI") by completing forty-eight hours of basic training within the first year of hire and forty hours of in-service training each year thereafter [Docs. 66-1 ¶ 6; 66-2 ¶ 4]. At the time of the incident involving Plaintiff, Defendants Young and Fink were current with their mandatory training requirements [Docs. 66-2 ¶¶ 8, 9; 66-1 ¶ 8; *see also* Doc. 66-2 p. 28, 104, 111].

Additionally, both individual Defendants had also received training on the use of force and certification to use a taser [Docs. 66-2 ¶ 6, p. 29, 106; 66-4 p. 7–9, 10]. Defendant Fink testified that he was trained on the use of force, including the use of force continuum, and that he was trained to use the least degree of force necessary in any given situation [Doc. 66-2 p. 12]. Defendant Fink stated he was trained that going "hands on" with an inmate was the last resort before deadly force was employed [Docs. 66-2 p. 13; 99-5 p. 2].

Defendant Young testified that he also received training in the use of a taser, and that this training on active and passive resistance as it relates to the use of a taser [Docs. 66-4 p. 17, 18; 66-5 p. 19–20]. He was also trained on the use of handcuffs, compliance holds, and chemical weapons [Doc. 66-4 p. 15]. Defendant Young further received training on the risk of harm that can result from the use of force [Doc. 66-5 p. 16]. Defendant Young was trained on the use of force continuum, and he testified that the type of force used is dependent on the response from the subject [*Id.* at 12–14]. But he was trained to use the "minimum and reasonable amount of force necessary" to achieve the correctional objective [*Id.* at 13, 15].

The County also developed written policies and procedures setting criteria pertaining to training and the use of force [*See, e.g.,* Doc. 66-1; Doc. 66-2; Doc. 92-4]. That written policy requires officers to "use only the force that reasonably appears necessary to accomplish lawful

10

objectives, to effectively bring an incident under control while protecting the lives of the officer and others and to preserve human life" [Doc. 92-4 p. 10]; to "use only the minimum and reasonable amount of force necessary to bring an incident under control" [*Id.* at 4]; and that "[t]he force used must be minimal under the circumstances, or only that amount of force that is sufficient to overcome the resistance, that amount of force necessary to attain a legitimate objective is authorized" [Doc. 66-1 p. 10]. And officers are trained consistent with that written policy, as they are trained to use the minimum amount of force necessary to control the given situation [Docs. 100-1 p. 2; 100-2 p. 2].

### C. Analysis

#### 1. *Monell* Liability

Because Plaintiff was a pretrial detainee at the time of the events giving rise to this lawsuit, the Fourteenth Amendment governs his excessive force claims. *See Kinglsey v. Hendrickson*, 576 U.S. 389, 397 (2015). Under the Fourteenth Amendment, a plaintiff makes a showing of excessive force by demonstrating "only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97 (holding that claim of Fourteenth Amendment excessive force claim does not have subjective component).

Here, it is undisputed that Plaintiff was offering only passive resistance, i.e., non-compliance with a command unaccompanied by any verbal hostility or evasive movements, both when he was tased by Defendants Fink and Young and when Defendant Fink initiated a takedown maneuver. And although disputed by Defendants, Plaintiff maintains that he had his hands behind his back when he was tased, and he was handcuffed when Deputy Fink utilized a leg sweep on Plaintiff. Viewing these facts in the light most favorable to Plaintiff, these actions could constitute an objectively unreasonable use of force. *See, e.g., LaPlante v. City of Battle Creek*, 30 F.4th 572,

583 (6th Cir. 2022) (noting takedown maneuvers are excessive when officers deal with a 'generally compliant' suspect" and officers "may not use physical force against a subdued, non-resisting subject" (citing *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006))); *Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) (holding takedown of physically compliant, non-threatening detainee who is not attempting to flee violates the Fourth Amendment[9]).  But the question now before the Court is not whether Defendants Young and/or Fink bear liability in this action.  It is whether Bradley County does.  And the Court turns its analysis toward that discussion.

A municipality (or county) may be sued under § 1983 "for constitutional injuries for which it is responsible."  *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).  But a municipality may be held liable only for its "*own* illegal acts.'"  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).  Accordingly, a plaintiff cannot recover against a municipality "for an injury inflicted solely by its employees or agents."  *Monell,* 436 at 694.  Instead, liability lies only where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]"  *Id.*

Such "municipal liability" claims, commonly referred to as *Monell* claims, require a plaintiff to show "an affirmative link between [a municipality's] policy or custom and the particular constitutional violation alleged."  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).  Thus, to hold a defendant liable under *Monell*, "a plaintiff must identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the

---

[9] "[A] pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment."  *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)).

12

execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and internal quotation marks omitted). A plaintiff may demonstrate *Monell* liability in any one of the four following ways:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted). Although different analyses apply to the different approaches, they "seek[] to answer the same fundamental question: did the municipality cause the harm or did an individual actor?" *Morgan*, 903 F.3d at 555.

Additionally, "[t]he plaintiff must almost demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* This is because "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Id.* at 415.

The Court addresses the applicability of all four theories of liability to Plaintiff's claims.

### a.    Illegal Official Policies

When proceeding under the first theory of *Monell* liability, under which a plaintiff must show an "illegal official policy or legislative enactment[,] the plaintiff must show that there were 'formal rules or understandings—*often but not always committed to writing*—that were intended to, and did, establish fixed plans of actions to be followed under similar circumstances consistently and over time.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (citing *Pembaur*, 475 U.S. at 480–81) (alterations omitted). Such "illegal official policy or legislative enactment"

13

may be "1) facially unconstitutional as written or articulated" and/or "2) "facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 692–94). And where the policy is facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Id.* (citing *Bryan Cnty.*, 520 U.S. at 407).

Plaintiff maintains that the County's liability is based on a written policy, General Order 1.3, which permits the use of force, including the use of a taser and hard hand controls, "against individuals who are, at best passively resisting" [Doc. 92 p. 17]. He argues that this policy permits the use of a taser on a passively resisting subject when lesser means of force "will result in a significant possibility of injury to the suspect or office" [*Id.* at 14.; referencing Doc. 92-4 p. 8]. Plaintiff notes, however, that it is always "possible" that a person could pose a threat of harm, and therefore, this policy permits County officers to use higher levels of force "on passively resisting individuals despite the clearly established law against using such force in those circumstances" [*Id.*]. Plaintiff further argues that the use of force continuum provides no guidance to an officer using hard hand controls or takedown maneuvers, despite equating hard hand controls with the use of a baton [*Id.* at 6, 14].

The County counters that the evidence establishes that it had extensive, proper policies in place regarding the use of force, noting these policies address issues pertaining to the type of force to be used, the continuum of force, how to use force, and the circumstances under which force is (and is not) appropriate. [Doc. 65 p. 8; *see also* Docs. 66-1; 66-2]. Specifically, Defendant notes that its training policy on the use of force states that officers "will only use the minimum and

14

reasonable amount of force necessary to bring the incident under control" [Doc. 92-4 p. 4]. Even so, a use of force may be necessary to enforce compliance with institutional policies, when a violation of that "policy creates an imminent threat to the safety of inmates or staff or the security of the institution" [*See* Doc. 66-1 p. 7, 9–10]. And an inmate refusing to lockdown presents a significant security risk [Doc. 99-1 p. 66]. Therefore, Defendant maintains, the level of force used to get Plaintiff to comply with a legitimate correctional objective was lawful, as his refusal to lockdown presented an imminent security threat in the jail [Doc. 100 p. 3–4].

This evidence, even when viewed in the light most favorable to Plaintiff, reflects that the County's general policy was to train and require officers to use the least amount of force thought necessary to bring an incident under control. And while the policy permits the use of force against persons only passively resisting and fails to offer descriptions as to specific examples of when the use of hands and feet force are appropriate, such a policy is not facially unconstitutional, because it is not "unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 459 (2008) ("[A] plaintiff can only succeed in a facial challenge 'by establish[ing] that no set of circumstances exist under which the [policy] would be valid,' i.e. that the [policy] is unconstitutional in all of its applications."). That is, the use of force against passively resisting individuals is excessive force in some circumstances. *See, e.g., Smith v. City of Troy,* 874 F.3d 938, 945 (6th Cir. 2017) (holding officer violated non-violent, passively resisting citizen's right to be free from excessive force when he conducted a leg sweep and landed on top of citizen); *LaPlante*, 30 F.4th at 581 ("We have determined that the use of a takedown maneuver, in a variety of scenarios, can amount to excessive force."). But it is not excessive force in all circumstances. *See, e.g., Crowell v. Kirkpatrick*, 400 F. App'x 592, 595 (2d Cir. 2010) (holding use of taser to effectuate arrest on noncompliant individuals reasonable in some circumstances);

15

*Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004) (holding use of pepper spray on inmate who "disobeyed repeated direct orders" was not excessive); *Siggers v. Renner*, 37 F. App'x 138, 140 (6th Cir. 2002) (holding use of pepper spray on inmate who refused to obey orders and was perceived as "an immediate and direct threat to the security of the institution" was not excessive); *Buckley v. Haddock*, 292 F. App'x 791, 792–93, 796 (11th Cir. 2008) (finding no excessive force when officer used taser in drive-stun mode against a handcuffed subject that was lying on the ground, crying and refusing to stand); *Schumacher v. Halverson*, 467 F. Supp. 2d 939, 952 (D. Minn. 2006) (explaining that the use of a taser in drive-stun mode against non-threatening suspect reasonable where his resistance and the circumstances "created a threatening situation" for the arresting officer). Therefore, the Court finds no genuine dispute whether the County's policies are facially constitutional.

Accordingly, the Court next considers whether the challenged policies are "facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory*, 444 F.3d at 752. Plaintiff points to evidence that Defendants Fink and Young had been involved incidents involving the same level of force against inmates for disobeying commands more than twenty times in the (roughly) two years preceding the incident involving Plaintiff [*See* Doc. 92 p. 7, 8; *see also* Doc. 92-6]. But the Court agrees with Defendants' argument that this evidence only documents that force was used against an inmate in an encounter; it is not proof that the officers' conduct was excessive or unconstitutional [*See* Doc. 93 p. 4–5].

Thus, Plaintiff's evidence shows only a policy that "might lead to '[officer] misconduct[.]'" *City of Okla. City*, 471 U.S. at 824 n.8. Such evidence "is hardly enough to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation." *Id.*

16

Accordingly, the record before the Court does not create a genuine dispute of material fact regarding the applicability of this first *Monell* theory of liability.

### b.     Ratification & Investigation

To the extent Plaintiff is pursing a theory that Bradley County bears liability based on the official ratification of the use of excessive force, he must "demonstrat[e] that an official with final decision-making authority ratified illegal actions."[10]  *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 270 (S.D. Ohio 2021) (citing *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020)).  "An official acting with the final decision-making authority may ratify the unconstitutional acts of its employees in two ways": (1) "through 'affirmative approval of a particular decision made by a subordinate[,]" *id.* at 270–71 (citing *Feliciano v. City of Cleveland*, 988 F.2d 649, 650 (6th Cir. 1993), or (2) "by 'failing to meaningfully investigate and punish allegations of unconstitutional conduct[,]'" *id.* at 271 (citing *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020)).

"To establish *Monell* liability for ratification based on a failure to investigate, a plaintiff needs to show "'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances."  *Hart v. Michigan*, 138 F.4th 409, 425 (6th Cir. 2025) (quoting *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 494–95 (6th Cir. 2020)).  Plaintiff points to evidence that Defendants Fink and Young had been involved incidents involving the same level of force against inmates for disobeying commands more than twenty times in the (roughly) two years preceding the incident involving Plaintiff [*See* Doc. 92 p. 7, 8; *see also* Doc. 92-6].  But the mere fact that force was used on these occasions is not proof that the officers' conduct was excessive or unconstitutional; it is just proof that a use-of-force incident occurred.

---

[10] It is not clear that Plaintiff is pursuing this theory, but the Court will address it because of his assertion that Lt Kanipes "ratified" the use of force by Defendants Young and Fink [Doc. 99 p. 4, 5, 7].

*See, e.g., Cretacci v. Hare*, No. 4:19-cv-55-SKL, 2021 WL 202997, at *7 (E.D. Tenn. Jan. 20, 2021) (citing *Loy v. Sexton*, 132 F. App'x 624, 627 n. 6 (6th Cir. May 23, 2005)).

And to the extent Plaintiff is pursuing a single-act ratification theory of *Monell* liability, he "must demonstrate that a 'deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question.'" *Burgess*, 735 F.3d at 479 (quoting *Pembaur*, 475 U.S. at 483). The course of action chosen or ratified by the policymaker "must be shown to be the moving force behind or cause of the plaintiff's harm." *Id.* (citing *Pembaur*, 475 U.S. at 484–85).

Plaintiff does not allege which official had final policymaking authority in this case. Plaintiff alleges only that "Defendant Bradley County's final supervisor" is "Sr. Lt. Kanipes" [Doc. 99 p. 7]. But "[w]hether an individual is a final policymaker for purposes of § 1983 liability is a question of state or local law, and a showing of policymaking authority typically requires specific evidence that the official's decisions were not subject to review or that the official could set policy related to broad goals." *Tlapanco v. Elges*, 969 F.3d 638, 658 (6th Cir. 2020). Here, Plaintiff has not presented any evidence that Lt. Kanipes is a policymaker for the County.

Regardless, Plaintiff does not explain how any deliberate choice by Lt. Kanipes was "the moving force behind" the harm to Plaintiff. *Burgess*, 735 F.3d at 479. Plaintiff has not produced any evidence that Lt. Kanipes directed force to be used against Plaintiff. And Lt. Kanipes' "after-the-fact approval of the investigation, which did not itself cause or continue a harm against [Plaintiff], [is] insufficient to establish the *Monell* claim." *Id*. Accordingly, the record before the

Court does not create a genuine dispute of material fact regarding the applicability of a ratification theory of liability.[11]

### c.      Failure to Train

Plaintiff's next theory of *Monell* liability is that the County (1) adopted a training program that teaches County deputies that they can use essentially the same level of force for someone who is actively resisting as the can for someone passively resisting and not posing a threat of harm; (2) failed to train Deputy Fink in control/compliance holds despite knowing that he would have to use those maneuvers; (3) adopted a program that does not provide any guidance on when to use the hard hand controls or take down maneuvers [Doc. 92 p. 16–18]; and (4) "provides no training to its officers in using a leg sweep or take down maneuver to make sure injuries are minimized" [Doc. 99 p. 6].

A municipality may be liable for failing to train or supervise its officers under § 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton v. City of Harris*, 489 U.S. 378, 388 (1989). But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train[,]" *Connick*, 563 U.S. at 61, because an "officer's shortcomings may have resulted from factors other than a faulty training program[,]" *City of Canton,* 489 U.S. at 390–91. It is not sufficient for a § 1983 plaintiff to show that his specific injury could have been prevented or avoided if the municipality had more or better training. *City of Canton*, 489 U.S. at 390–91.

---

[11] Plaintiff alleges that the County "deliberately allowed crucial evidence–i.e. the video of the incident–to be destroyed" [Doc. 92 p. 18 n. 28]. But he has not presented evidence that Lt. Kanipes deliberately destroyed (or directed the destruction of) evidence to quell any investigation into the incident involving Plaintiff. *See Burgess*, 735 F.3d at 479 (citing *Moldowan v. City of Warren*, 578 F.3d 351, 394 & n. 20 (6th Cir. 2009)). Rather, Lt. Kanipes testified that he went to preserve the video of the incident after learning of Plaintiff's lawsuit and learned from the IT department that the camera system had overwritten the recording [*See, e.g*., Doc. 99-1 p. 27–28].

19

To establish municipal liability under a failure-to-train theory, "a plaintiff must show: '(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

The Court resolves this theory of liability on the second requirement—deliberate indifference. That is, even if the Court were to assume the training provided to correctional officers by the County is inadequate (which it does not), Plaintiff fails to establish a genuine dispute as to whether the failure to train is the result of deliberate indifference.

To show a municipality's deliberate indifference as to training, a plaintiff must demonstrate either (1) a "pattern of similar constitutional violations by untrained employees" or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (internal quotation marks and citations omitted).

Plaintiff has not shown the requisite pattern of unconstitutional conduct that would amount to deliberate indifference on the part of the County. Plaintiff attempts to make such a showing by filing various "subject resistance/use of force" reports that have been produced through discovery [*See* Doc. 92-6]. As noted above, however, these instances show only that force was used in an interaction between correctional personnel and persons in custody. They are not proof of "pattern[s] of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62.

As to the single-violation theory of municipal liability for failure to train, Plaintiff has failed to present any evidence to support an "obvious potential" for constitutional violations on the

part of the County. *Shadrick*, 805 F.3d at 739. Defendant's policy guidance regarding its training on use of force plainly states that officers "will only use the minimum and reasonable amount of force necessary to bring the incident under control" [*See, generally,* Doc. 92-4]. The County has presented evidence that it operates pursuant to written policies that set criteria for officer training and the use of force (including the use of tasers), and that compliance with the training policies and procedures is a condition of employment with Bradley County [Docs. 66-1; 66-2]. Further, the County has presented evidence that the individual Defendants involved in this matter received proper training to work as corrections officers as approved by the Tennessee Corrections Institute ("TCI"), were current with their mandatory training requirements, received training on the use of a taser, and received training on the use of force [Docs. 66-1; 66-2].

Thus, the County provides its officers initial training, yearly training, and taser training, and the Defendants involved in this incident received use-of-force training. While Plaintiff attempts to rely on the County's lack of training as to specific maneuvers, "[t]hat sort of nuance simply cannot support an inference of deliberate indifference" under the facts presented. *Connick*, 563 U.S. at 67. This case does not involve the type of "limited on-the-job training" that amounted to "no training at all" in *Shadrick*. *See Howell*, 67 F.4th at 320 (discussing *Shadrick* and finding "County did not wholly fail to train" its officers where it relied on initial and on-the-job training and officers "displayed knowledge of and familiarity with the relevant policies"). And Plaintiff cannot establish deliberate indifference by merely showing that an injury could have been avoided if the County had provided more or better training. *See City of Canton*, 489 U.S. at 392 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident. . .").

Accordingly, the record before the Court does not create a genuine dispute of material fact regarding the applicability of a failure-to-train theory of *Monell* liability.

### d. Custom of Tolerance or Acquiescence

To state a "custom of tolerance or acquiescence" under the fourth *Monell* theory of liability, Plaintiff must prove:

(1) the existence of a clear and persistent pattern of unconstitutional conduct;
(2) notice or constructive notice on the part of the [County];
(3) the [County's] tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction; and
(4) that the [County's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

Plaintiff's reliance on this theory fails at the first step, because as noted above, Plaintiff has not demonstrated the existence of a clear and persistent pattern of unconstitutional conduct. The list of incidents provided in discovery involve uses of force for disobeying commands [Doc. 92-6]. Some involve active resistance, others passive resistance [*Id*.]. Most involve the use of a chemical agent, while at least one incident involved the use of a takedown [*Id*.]. But these incidents are not proof of a previous finding of unconstitutional behavior by a County officer.

Therefore, the record before the Court does not create a genuine dispute of material fact regarding the applicability of a custom or tolerance theory of liability.

Accordingly, the Court finds Plaintiff has not set forth sufficient proof to support a reasonable jury holding the County liable on Plaintiff's *Monell* claim, and the County's motion for summary judgment as to the *Monell* claim against it will be granted.

### 2. State Law

Plaintiff also claims, however, that the County is liable for the conduct of its deputies under Tenn. Code Ann. § 8-8-302 [Doc. 1 in No. 1:24-cv-56]. The County argues that (1) it bears no liability under this statute, (2) Plaintiff does not limit the statute's applicability to a specific cause of action, and (3) if the Court denies partial summary judgment on this issue, it should issue a declaration that the County's maximum exposure "can be no more than the minimum amount required by statute" [Doc. 65 p. 11].

Section 8-8-302 provides as follows:

> Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

Tenn. Code Ann. § 8-8-302(a). This permits a plaintiff to "recover from a governmental entity for the intentional misconduct of a deputy under this statute" if "the misconduct occurred while the deputy was acting by virtue of or under color of his office." *Currie v. Haywood Cnty.*, No. W2010-00453-COA-R3-CV, 2011 WL 826805, at *3 (Tenn. Ct. App. Mar. 10, 2011) (citation omitted). Defendants do not argue that they were not acting under color of office when the incident involving Plaintiff occurred. And, as Plaintiff notes, he alleges only civil rights and intentional torts claims[12] [*See, e.g.,* Doc. 92 p. 19–20]. *See Jenkins v. Loudon Cnty.*, 736 S.W.2d 603, 608–09 (Tenn. 1987) (holding the TGTLA covers negligent conduct and § 8-8-302 covers "non-negligent" act of a deputy and is applicable to claims for the violation of a person's civil rights), *abrogated in part by Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73 (Tenn. 2001) (collecting additional cases). Therefore,

---

[12] The Tennessee Governmental Tort Liability Act ("TGTLA") would provide the County immunity to any of Plaintiff's claims sounding in negligence. *See* Tenn. Code Ann. § 29-20-101, *et seq.*; *Johnson v. City of Memphis*, 617 F.3d 864, 872 (noting retention of immunity for civil rights claims where the same circumstances give rise to both negligence and civil rights claims). But Plaintiff does not assert any negligence claims.

23

the County's motion for summary judgment as to Plaintiff's state-law claims will be denied as to the applicability of § 8-8-302. And as the County has not presented any authority suggesting that Plaintiff must identify specific causes of state-court action, his motion for a declaration will be denied. However, Bradley County's motion will be granted only insofar as the Court notes the liability limit for violation of this statute is capped at $100,000.[13] *See* Tenn. Code Ann. § 8-8-303(a) ("The governmental immunity of the county in which the sheriff serves is waived for purposes of § 8-8-302, but to an extent not in excess of the minimum amount required for a surety bond applicable to that county's sheriff pursuant to § 8-8-103.").

## III. CONCLUSION

There are no genuine disputes of material fact as to Plaintiff's *Monell* claim that preclude resolving this issue on summary judgment, and the County Defendant's motion [Doc. 64] is **GRANTED in part and DENIED in part** as follows:

The County Defendant's motion is **GRANTED** as to Plaintiff's *Monell* claim. The County Defendant's motion for summary judgment as to Plaintiff's claim pursuant to Tenn. Code Ann. § 8-8-302 is **DENIED**, and the County Defendant's request for a declaration is **DENIED** as to the County's request for identification of specific causes of action and **GRANTED** insofar as the Court notes the liability limit under Tenn. Code Ann. § 8-8-302 is capped at $100,000.

**SO ORDERED**.

**ENTER:**

**s/ J. RONNIE GREER**
**UNITED STATES DISTRICT JUDGE**

---

[13] A county's exposure under § 8-8-302 is based on the minimum amount required for a bond for the county sheriff in Tenn. Code Ann. § 8-8-103, which requires a minimum bond of $100,000. *See* Tenn. Code Ann. § 8-8-103.

25